# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Mark Falk |
| | : | |
| v. | : | Mag. No. 15-3594 |
| | : | |
| MITCHELL G. ADAM | : | CRIMINAL COMPLAINT |
| | : | |

I, Gregory Yankow, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Gregory Yankow, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

May 15, 2015 at
Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

## Conspiracy to Commit Securities Fraud, Mail Fraud and Wire Fraud

From at least as early as in or about July 2013 through in or about November 2013, in the District of New Jersey and elsewhere, defendant

### MITCHELL G. ADAM

knowingly and willfully conspired and agreed with each other and others to commit an offense against the United States, to wit: (a) securities fraud, contrary to Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5;  (b) mail fraud, contrary to Title 18, United States Code, Section 1341; and (c) wire fraud, contrary to Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

## Securities Fraud

It was a part and object of the conspiracy that defendant MITCHELL G. ADAM, and others, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Mail Fraud

It was a further part and an object of the conspiracy that defendant MITCHELL G. ADAM, and others, knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did cause things to be deposited with and delivered by the U.S. Postal Service and private and commercial interstate carriers for the purposes of executing such scheme and artifice, as set forth in paragraph 18 below, in violation of Title 18, United States Code, Section 1341.

## Wire Fraud

It was a further part and an object of the conspiracy that defendant MITCHELL G. ADAM, and others, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did cause to be transmitted by wire communication in interstate commerce any writings, signals, pictures, and sounds for the purposes of executing such scheme and artifice, including as set forth in paragraphs 15 through 17 below, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

In furtherance of the conspiracy and to effect its unlawful objects, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

a.    On or about September 23, 2013, a co-conspirator caused several stock purchase agreements to be sent via email from his law firm in New York City to a cooperating witness and undercover law enforcement agent to facilitate the sale of approximately five million shares of HBP Energy Corp. ("HBPE") stock.

b.    On or about October 7, 2013, a co-conspirator directed one of his nominees to place a 5,000 share "sell" order for HBPE stock priced at ten cents per share.

c.    On or about October 16, 2013, in furtherance of the above-referenced transaction, defendant MITCHELL G. ADAM sold approximately five million HBPE shares from nominee entities that he controlled to an undercover law enforcement agent.

d.    On or about October 17, 2013, a co-conspirator caused a stock certificate for five million free trading HBPE shares to be sent by Federal Express to Belleville, New Jersey.

All in violation of Title 18, United States Code, Section 371.

2

## ATTACHMENT B

I, Gregory Yankow, a Special Agent with the Federal Bureau of Investigation, having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part. Moreover, where I refer to the contents of recorded conversations, my quotations are based on preliminary draft transcripts of those conversations and are reported in substance and in part.

## RELEVANT INDIVIDUALS AND ENTITIES

1. At all times relevant to this Complaint, unless otherwise indicated:

a. Defendant MITCHELL G. ADAM was a Canadian citizen and resident of Vancouver, British Columbia and a penny stock promoter.[1]

b. Co-conspirator #1 ("CC#1") was a Canadian citizen residing in London, England. Cc#1 promoted and solicited private financing for public companies.

c. Co-conspirator #2 ("CC#2") was a resident of New York, New York, and a licensed attorney. CC#2 owned multiple entities located in New York, New York, including his law practice and a registered broker-dealer.

a. A Cooperating Witness (the "CW") was the founder and owner of a registered broker-dealer located in New York and a registered broker dealer located outside of the United States. In or about July 2012, the CW began cooperating with law enforcement. The information provided by the CW has been corroborated through, among other things, consensually recorded calls and meetings, as well as through documentary evidence, including emails, trading records, and bank records. Accordingly, I believe the CW is a reliable source of information concerning the subject matters described herein.

d. Dynastar Holdings, Inc. ("DYNA") was a Nevada corporation headquartered in Louisville, Kentucky. It purported to be engaged in social media and direct marketing business and, during the relevant time period, its common stock was quoted on OTC Pink.

---

[1] The term "penny stock" refers to the stock of publicly traded companies with low share prices that are often traded on the following quotation services and marketplaces, among others: OTCBB, OTC QB, OTC Pink, or Pink Sheets.

e.    HBP Energy Corp. ("HBPE") was Nevada corporation
incorporated in or around October 2012 under the name Lido International
Corp. ("LIDO"). In its public filings with the United States Securities and
Exchange Commission ("SEC"), LIDO claimed that it was a development stage
company with limited operations; that it was headquartered in Sonsonate, El
Salvador; and that its intent was to engage in "the consulting business in
commercial cultivation of champignon mushrooms." On or about September 5,
2013, LIDO announced that it had changed its name to HBP Energy Corp. in
order to "facilitate" its ongoing "discussions" with Firebird Petroleum, Inc., a
private Texas corporation, "regarding a possible business combination." LIDO's
common stock was quoted on the OTC QB marketplace, operated by OTC
Markets Group Inc., under its old symbol LIDO.

## DEFINITIONS OF RELEVANT TERMS

2.    "Market manipulation" is an attempt to interfere with the free and
fair operation of the stock market by creating artificial, false, or misleading
appearances with respect to the price of, or market for, a security of a publicly
traded company.

3.    A "pump and dump" is one method of market manipulation. Pump
and dump schemes typically involve fraudulently inflating the price and trading
volume of penny stocks and then selling those stocks at the fraudulently
inflated prices to the investing public for a profit. There are generally three
phases to a pump and dump scheme: (1) obtaining and concealing control of a
significant portion of a publicly traded company's stock, often through a
reverse merger; (2) fraudulently inflating the price and trading volume of the
company's stock through a variety of means, including disseminating false
and/or misleading promotional materials to the investing public and engaging
in manipulative trading of the company's stock to create the appearance of
market interest; and (3) once the stock price has been fraudulently inflated,
selling the stock at the fraudulently inflated price, thereby profiting at the
expense of the investing public.

## BACKGROUND

4.    In or around the summer of 2012, CC#2 contacted the CW to
discuss the possibility of the CW participating in a market manipulation
scheme involving the stock of DYNA. Specifically, CC#2 recruited the CW to
engage in manipulative trading of DYNA's stock to create the appearance of
market interest and volume. The CW, who at the time was cooperating with
law enforcement, agreed to participate in the scheme. The CW also introduced
an undercover law enforcement agent (the "UC") to CC#2 as a business partner

2

with whom the CW would trade DYNA shares in a manipulative manner to create volume in the stock.

5.     During several consensually recorded calls and meetings, the CW and CC#2 continued to discuss the DYNA promotion, and different ways in which the CW could manipulate the price of DYNA stock. For example, during a consensually recorded meeting on or about July 11, 2013, the CW told CC#2 that he had created an algorithmic trading system, or "black box" (hereinafter, the "Black Box"), that he specifically developed for manipulating stocks. The CW explained that he controlled approximately 32 online brokerage accounts in the names of foreign nominees, and that a computer program that he created and controls can trade between these accounts to create the appearance of market interest and massive volume in any stock. The CW proposed using the Black Box in connection with the DYNA scheme, noting that the stock is "just going to go nuts as if this stock is the next biggest thing." CC#2 agreed.

6.     In or around July 2013, CC#2 informed the CW that they should put the DYNA scheme on hold because CC#2 had another, more lucrative oil and gas deal – HBPE – with "big hitters" from overseas, who the CW later learned were CC#1 from London, England and ADAM from Vancouver, Canada. CC#2 informed the CW that they would pick up with the DYNA scheme upon completing the new, more lucrative deal.

## OVERVIEW OF THE HBPE SCHEME

7.     As with the DYNA scheme, CC#2 solicited the CW to engage in manipulative trading of HBPE's stock, this time using his Black Box, and to assist in the creation of a promotional mailer for HBPE. From the beginning of the scheme, CC#2 made it clear that he, CC#1 and ADAM were "looking for someone to run the market, walk [the stock] up and to coordinate" stock trading with other promotional activities, as described below.

### A.     The CW Meets CC#1 and ADAM

8.     On or about August 21, 2013, CC#1 arranged for the CW to meet with CC#1 and ADAM at a hotel in New York City. CC#2 was not physically present for the meeting, which was consensually recorded by the CW, but participated in a portion of it via telephone.

9.     During the meeting, the CW explained his Black Box to CC#1 and ADAM, stating that he controlled 32 online brokerage accounts that "don't tie back" to him and that were "owned by offshore people." The CW told CC#1 and ADAM, among other things, that if news were to be released about the subject company, he could "push the button" and "light it up like Google just came out

with earnings." The CW made clear that he could walk a stock to a desired price level through manipulative trading using the Black Box.

10.    ADAM then described his and CC#1 business model as follows:

> Generally what we do is we ... have corporations, acquire shares and keep it under the radar and then it's all sort of gate-keeped so that no one entity can destroy the market ... We don't have a pool because you're not allowed to, but we've got a pool that's being managed.[2]

## B.    The HBPE Promotion

11.    Over the course of subsequent consensually recorded meetings in September and October 2013, CC#1, CC#2, and ADAM presented to the CW an elaborate stock manipulation and promotion plan that would commence in late October 2013 and continue through December 2013. CC#1, CC#2 and ADAM explained that they controlled all of the unrestricted stock of HBPE, either directly or through nominees, and that the planned stock promotion campaign would be conducted in conjunction with HBPE's acquisition of multiple oil exploration projects and public announcements of these acquisitions. They also explained that the promotion would include multiple international "call rooms,"[3] a series of "road shows" in Europe, listing the company on a German exchange, and a massive electronic and direct-mail advertising campaign.

12.    In furtherance of the scheme, CC#1, CC#2, and ADAM agreed that the CW, using his Black Box and the assistance of the UC (the same undercover law enforcement agent referenced in connection with the DYNA scheme above), would manipulate the stock to create an attractive price and volume chart for HBPE in advance of and during the planned promotion. Among other things, ADAM and his co-conspirators agreed that:

> a. The CW would buy approximately 5 million of the purportedly unrestricted HBPE shares from entities that CC#1 and/or ADAM controlled in private, off-market transactions.

---

[2] In the context of stock market manipulation schemes, a "pool" generally means an agreement among a group of traders to delegate authority to a single manager to trade in a specific stock for a specific period of time and then to share in the resulting profits or losses.

[3] A "call room" or "boiler room" is a call center selling investments by telephone. While call rooms are sometimes used to promote legitimate investments, they have been frequently used in the penny-stock industry to facility market manipulation schemes like those alleged herein.

    b.  The CW would buy the remaining unrestricted HBPE shares through pre-arranged trades with the defendants' nominees;

    c.  After the CW acquired the HBPE stock from the defendants and their nominees,, the CW would deploy his Black Box to walk up the stock price by cross-trading the HBPE shares between multiple online brokerage accounts that he controlled;

    d.  CC#1 would arrange for some of his close friends and associates to buy HBPE stock - planned at $1 million or more - from the CW at relatively low prices, in pre-arranged transactions, with the understanding that these early buyers would later be told when they could sell at a profit;

    e.  The proceeds of these early buyers' purchases would be transferred from the CW to ADAM, also by means of pre-arranged trades, and ADAM would use these proceeds to pay for the stock promotion expenses, such as the call room and advertising campaign costs;

    f.  At the completion of the scheme, the defendants and their nominees would sell their shares into the market at the inflated prices, and the ADAM, his co-conspirators, and the CW would split the profits according to agreed-upon percentages.

13.    Throughout the consensually recorded meetings, ADAM and his co-conspirators repeatedly acknowledged the plan for the CW to "walk up" or "pull up" the stock price to various levels at various times during the course of the scheme using manipulative methods. For example, during a consensually recorded meeting between the CW, CC#1 and ADAM on or about August 21, 2013, the CW asked CC#1 for the price range in which he wanted the stock to trade during the beginning of the promotion. The following exchange occurred:

CW:        So from the time I buy the shares, I'm not going to let anyone buy the shares from a penny up to 50 cents. I'm just going to trade it myself.

CC#1:      Yeah.

CW:        Through those accounts.

CC#1:      Yeah.

CW:     Bring it up to fifty cents. Do you want me to have shares out there for people to buy at fifty cents, or only at a dollar?

CC#1:    Well, we'll do let's say half a million at 50 cents and another half a million to a million between fifty cents and a dollar and then we'll move it up to a buck fifty, again with you doing it. I may bring some buying in.

A few minutes later, ADAM further discussed the timing of the CW's manipulative trading and stated, "and then then you [the CW] will do some trades, and then you'll walk it to a price, and say – let's turn on the phone room."

## C. The Defendants Transfer HBPE Shares to the CW to Facilitate the Scheme

14. To put the scheme in motion, in late September 2013, CC#1 and ADAM – operating through nominee entities – initiated private off-market sales of approximately five million shares of HBPE stock to the CW. Similar to the DYNA scheme, the UC posed as the CW's nominee and "business partner" for purposes of this transaction.

15. Specifically, on or about September 23, 2013, CC#2 caused several stock purchase agreements to be sent to the UC via email to facilitate the transfer of the HBPE shares to the UC and the CW. On or about October 1, 2013, the UC sent CC#2 back via email the signed stock purchase agreements.

16. On or about October 7, 2013, the UC caused approximately $73,100 to be wired from a bank account in New Jersey to CC#2's bank account in New York.

17. Thereafter, on or about October 16, 2013, at CC#2's direction, ADAM sold approximately five million HBPE shares from nominee entities that he controlled to the UC.

18. On or about October 17, 2013, pursuant to the transaction, CC#2 caused a stock certificate for five million free trading HBPE shares in the name of the UC's company to be mailed via Federal Express to the UC in Belleville, New Jersey.

## D. Sale of HBPE Shares in Furtherance of the Scheme

19. On or about October 7, 2013, CC#1 directed one of his nominees to place a 5,000 share "sell" order for HBPE stock priced at $0.10 per share. On the same date, the "sell" order that CC#1 directed was executed in the open market. The purpose of this transaction was to begin to create the appearance

6

of legitimate market interest in HBPE's stock prior to the start of the CW's manipulative trading.